J-S27039-21

2022 PA Super 43

COMMONWEALTH OF PENNSYLVANIA  :   IN THE SUPERIOR COURT OF
                                                          :          PENNSYLVANIA
                                                          :
                          v.                              :
                                                          :
                                                          :
JULIO FUENTES                            :
                                                          :
                   Appellant                    :    No. 1301 WDA 2020

Appeal from the Judgment of Sentence Entered March 11, 2020
In the Court of Common Pleas of Allegheny County
Criminal Division at No(s):  CP-02-CR-0006631-2018

BEFORE:   OLSON, J., NICHOLS, J., and COLINS, J.[*]

OPINION BY COLINS, J.:                                       **FILED: MARCH 9, 2022**

Julio Fuentes appeals from the judgment of sentence imposed following a jury trial in which Fuentes was found guilty of rape of a child, unlawful restraint of a minor, indecent assault, corruption of minors, and unlawful contact with a minor.[1] For these offenses, Fuentes received an aggregate sentence of fourteen to twenty-eight years of incarceration to be followed by fifteen years of probation. On appeal, Fuentes presents six issues for review, contending, *inter alia*, that his trial verdict was against the weight of the evidence and that the trial court improperly permitted an expert to testify. As we find one issue raised by Fuentes to warrant further adjudication by the

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] **See** 18 Pa.C.S.A. § 3121(c); 18 Pa.C.S.A. § 2902(b)(2); 18 Pa.C.S.A. § 18 Pa.C.S.A. § 3126(a)(7); 18 Pa.C.S.A. § 6301(a)(1)(ii); and 18 Pa.C.S.A. § 6318(a)(1), respectively.

lower court, we remand this matter in order to ascertain what amount of credit Fuentes is due for his time served prior and related to his trial.

By way of background, Fuentes lived in an apartment with his wife and their four children.[2] Fuentes's mother-in-law, who had legal custody of the seven-to-eight-year-old victim, inhabited another apartment that was down the hall from Fuentes. The victim would split time between the two apartments, depending on the mother-in-law's work obligations.

Through the victim's testimony, she described one incident where Fuentes touched her genital area and thereafter proceeded to manipulate her hand to touch his genital area. In a separate event, the victim communicated that she had been handcuffed to a bed, gagged, blindfolded, and then raped by Fuentes.

After these acts transpired, the victim confided in a mandated reporter at her school,[3] which led to a forensic interview.[4] However, because that interview did not yield a disclosure, the police took no further action on this first child line report. The victim would later indicate that she did not reveal anything at this interview because she was afraid of Fuentes.

_____

[2] The record indicates that Fuentes would only sometimes stay in this apartment. ***See, e.g***., N.T., 11/20/19, at 74.

[3] ***See*** 23 Pa.C.S.A. § 6311(a)(4).

[4] Although the timeline is unclear, the victim seemingly first tried to tell Fuentes's wife and a friend of the wife about her first sexual encounter with Fuentes, but neither believed nor helped the victim. ***See*** N.T., 11/20/19, at 56.

Just shy of two years later, another mandated reporter, this time at the Office of Children, Youth, and Families, sent a second child line report into the Allegheny County Police Department. Correspondingly, the victim participated in a second forensic interview, which resulted in Fuentes's arrest. The victim believed that it was safe to disclose pertinent information about Fuentes's treatment of her at this second interview because she was safely out of her previous living situation by that point.

While she could not remember all the details about the second incident with Fuentes involving the handcuffs, she remembered that Fuentes's wife told the victim to go get Halloween candy from the couple's bedroom whereafter Fuentes followed her into the bedroom and then assaulted her. Fuentes's wife had apparently left the apartment directly after allowing the victim to get the candy. Fuentes stopped when he heard his wife reenter the apartment.

Ultimately, Fuentes was charged[5] and convicted of the above-mentioned offenses. Prior to trial, Fuentes filed a motion to exclude expert testimony on the basis that the Commonwealth's proposed expert allegedly had personal knowledge of the victim's case insofar as she signed both reports generated after the victim's forensic interviews. The trial court denied this motion.

A first and second jury trial resulted in hung juries. At the third jury trial, Fuentes was found guilty and sentenced to the aforementioned fourteen to

---

[5] Several other charges were either withdrawn, demurred, or resulted in acquittal. *See* Order of Sentence, 3/11/20, at 1-2 (unpaginated).

twenty-eight years of incarceration followed by fifteen years of probation.

Following sentencing, Fuentes filed a post-sentence motion, which was denied as a matter of law.[6] After this denial, Fuentes filed a timely notice of appeal to this Court. The relevant parties have complied with their obligations under Pennsylvania Rule of Appellate Procedure 1925, and as such, this appeal is ripe for review.

On appeal, Fuentes presents six issues:

1. Was the verdict as to all of his convictions against the weight of the evidence?

2. Did the trial court abuse its discretion in constructing Fuentes's sentence?

3. Was the mandatory minimum sentence corresponding to his rape conviction unconstitutional?

4. Is the process by which sex offenders are paroled and provided treatment unconstitutional?

5. Did the trial court improperly permit one of the Commonwealth's witnesses to testify as an expert?

6. Did the trial court impose an illegal sentence by failing to give credit for time served?

*See* Appellant's Brief, at 3.

_____

[6] Several days after Fuentes was sentenced, Allegheny County went under a judicial emergency due to conditions surrounding the Covid-19 pandemic, which suspended time calculations and deadlines until June 1, 2020. Accordingly, while Fuentes's post-sentence motion was facially untimely as it was filed more than thirty days after sentencing, it is of no moment, as it was still filed within the parameters as outlined under the order governing Allegheny County's judicial emergency.

Fuentes first asserts that the verdict resulting in his convictions was against the weight of the evidence. Specifically, Fuentes contends that the victim's "testimony pertaining to the facts and circumstances of the alleged assaults was contradictory and incredible. [The victim's] account of the alleged assaults, taken together with all the other testimony, is implausible if not impossible." *Id*., at 10.

We are guided by a well-settled set of precepts when addressing a weight-of-the-evidence claim. First, we note that "[t]he weight of the evidence is exclusively for the finder of fact, who is free to believe all, none or some of the evidence and to determine the credibility of witnesses." **Commonwealth v. Clemens**, 242 A.3d 659, 667 (Pa. Super. 2020) (citation omitted). Second, a verdict will only be reversed on this basis where the evidence is "so tenuous, vague and uncertain that the verdict shocks the conscience of the court." **Commonwealth v. Akhmedov**, 216 A.3d 307, 326 (Pa. Super. 2019) (*en banc*) (citation omitted). Third, the fact-finder is charged with the responsibility to resolve contradictory testimony and questions of credibility, and we may not substitute our judgment in place of the fact-finder. **See Commonwealth v. Cramer**, 195 A.3d 594, 600 (Pa. Super. 2018).

A motion for a new trial based on a weight-of-the-evidence claim, like what happened in this case, is addressed to the discretion of the trial court, and therefore, we review only the lower court's exercise of discretion and not the underlying question of whether the verdict is against the weight of the

evidence. *See Commonwealth v. Wallace*, 244 A.3d 1261, 1276 (Pa. Super. 2021). When reviewing a trial court's determination on a weight claim, we give the "gravest consideration to the findings and reasons advanced by the trial judge" because it is the trial judge, not the appellate court, who had the opportunity to see and hear the evidence presented. *Id.* (citation omitted).

After laying out the testimony that was adduced at trial, the trial court found that [d]espite minor inconsistencies in the victim's testimony, she testified credibly regarding two instances of sexual assault by [Fuentes]." Trial Court Opinion, 4/15/21, at 5. Therefore, [i]t was not unreasonable for the jury to conclude that [Fuentes] had committed the crimes for which he was convicted." *Id*.

In contrast, Fuentes illuminates inconsistences or apparent discrepancies between the victim's first forensic interview, the second forensic interview, and the testimony the victim provided at trial.

For example, Fuentes describes the victim's first interview, which did not lead to any kind of crime-related disclosure, as one in which the victim indicated that she felt safe with Fuentes's wife and mother-in-law. *See* Appellant's Brief, at 13. As it pertained to Fuentes, the victim merely stated at that point that he was mean to her and would yell under certain circumstances. At the second interview, the victim stated that there had been multiple instances of sexual contact between Fuentes and her. However, at trial, the victim only testified to there having been two situations of a sexual

nature between Fuentes and her.[7]

Fuentes also highlights ambiguity between the victim's reported age at the time of the handcuffing incident and the month that she stated it occurred. *See id*. (comparing an ostensible conflict between the victim's second interview and the victim's trial testimony). Moreover, Fuentes points to differences between the way the victim described how the two sexual encounters ended. For example, in the second interview, the victim relayed that Fuentes became tired and therefore stopped, but at trial, she conveyed that he had heard his wife come back into the apartment.

Furthermore, Fuentes emphasizes the disparate nature of the victim's reported positioning during the second sexual incident (e.g., how she was handcuffed and the orientation of her arms and legs) and relatedly, the injuries, or lack of injuries, she obtained as a result of Fuentes's actions. Fuentes concludes by pointing to incongruities between the victim's second interview and at trial related to: (1) how the victim came to be in the wife's bedroom leading up to the second sexual assault, specifically when the wife typically kept the bedroom door locked; (2) where the wife was or what she was doing during the second sexual assault; and (3) the number of persons the victim opened up to about the incidents. *See id*., at 14-15.

---

[7] It is unclear how the Commonwealth's decision to limit the questions it asked of the victim to only two of the incidents inherently renders an unreliable verdict. Moreover, there is no indicia that Fuentes asked the victim at trial about the other incidents outlined in the second forensic interview.

Relatedly, Fuentes compares the victim's testimony with other testimonies provided at trial to further diminish the victim's reliability. In particular, Fuentes cites to witnesses indicating that Fuentes had a limited presence in the apartment during the year the victim was assaulted and, apparently to cast doubt on Fuentes having had enough time to perform the sexual acts he was accused of, that family members would come and go as they pleased into the apartment and that his children were always present. Fuentes also utilizes his own testimony to establish that "[t]here was never a time when [he] was alone with [the victim]." *Id*., at 15 (citation to the record omitted).

Preliminarily, we note that other than providing this Court's standard of review when addressing a weight-of-the-evidence claim, Fuentes has not provided any authority whatsoever to demonstrate the validity of his underlying assertion: that the victim's testimony was so unreliable that it could not act as a basis on which to convict him. Absent any analogous precedent, Fuentes purely relies on a fact- or record-based approach.

We note that "[o]ne of the least assailable reasons for granting or denying a new trial is the lower court's conviction that the verdict was or was not against the weight of the evidence and that a new trial should be granted in the interest of justice." *Commonwealth v. Clay*, 64 A.3d 1049, 1055 (Pa. 2013) (citation omitted). The trial court went through, in detail, the victim's testimony at trial and the statements she made during her forensic interviews.

Ultimately, the court reached a conclusion that, instead of the verdict being against the weight of the evidence, it was "rather supported by it." Trial Court Opinion, 4/15/21, at 3-5. We find that the court did not abuse its discretion in reaching this conclusion.

First, the jury was well-apprised of the inherent difficulties associated with eliciting information pertinent to a sexual assault from a child, based both on a child's verbal ability to express what has happened and also his or her willingness to report the same. In describing the disparate ways in which children disclose sexual assaults, one of the Commonwealth's experts[8] identified that

> [s]ometimes they tell that story and they may only tell a little bit of it and give only a little bit of details. Sometimes they may tell the story and give a little bit of details now or a little bit more details to the next person. That story may change a little bit in between based on the person they're talking with or a question or prompt from that person. Some children just tell everyone about their story, every person they have an encounter with. So it's different for every child and no disclosure is the same.

N.T., 11/20/19, at 106. That same expert went on to describe how children will not disclose information if they believe it will lead to a negative reaction or a dismissive reaction. *See id*., at 107-08. Further, children may be driven by fear if they are having problems communicating something. *See id*., at 108-09. In addition, "young children may not actually be able to put into words

---

[8] Fuentes challenges the admission of this specific expert's testimony in his fifth issue raised on appeal.

the acts that actually have occurred to them. It's not until they get older and actually start to gain the reference and the more adult knowledge of those acts to actually speak about it." ***Id.***, at 111. The expert then brought up the rationale behind a child recanting statements he or she has made, primarily predicated on a child wanting his or her life to return to normal. ***See id***., at 112-13.

A second expert opined that:

[i]t's a commonly known phenomena if the child has been sexually abused, [he or she] might have a delayed disclosure; meaning, [he or she] might not tell anybody what has happened to [him or her] for days, weeks, months or even years.

There's a lot of reasons behind that. One of which might be a child might not have recognized what happened to [himself or herself] was wrong because it happened when [he or she was] so young and [he or she] didn't know any different, et cetera, or [he or she] might have been scared or threatened by a person or shamed and made to believe that what happened to [himself or herself] was [his or her] fault.

So kind of under that subset, there's often a delayed disclosure. So if a child had had injuries at any point, by the time we're seeing a child, it might be years after something happened, and if there were an injury initially, it could have healed.

N.T., 11/20/19, at 139-40.

At trial, the victim explained that she did not disclose or admit to the sexual assaults at her first forensic interview because she "was scared, because at the time [she] was still living with [Fuentes's wife] and [Fuentes]." ***Id***., at 66. The victim further stated that she thought Fuentes "would do something," ***id***., if she were to say anything about what had happened. When

the victim sat for the second interview, she felt safer as she was not living with or around Fuentes. *See id*., at 66-67. The second interview also resulted in the victim explaining to the interviewer why she did not disclose the second sexual assault: because she did not think the wife would believe her, given that "she didn't believe [the victim] whenever [she] told her the first time." Forensic Interview 2, 4/6/18, at 37-38.

As to Fuentes pointing out an asserted inconsistency between the victim's age as she reported the two sexual assaults and the particular months those incidents occurred, we find that Fuentes is asking this Court to ascribe too much weight to the victim's use of the phrase "when I turned eight." Fuentes's implication is that the victim uttering the word "when" implies the birthday and assault occurring in the same month.

At the second forensic interview, the victim stated that the first assault happened when she was "still seven," *id*., at 38, but that the second event occurred "when [she] turned eight." *Id*. During trial, the victim indicated that the second incident happened around the month of April. *See* N.T., 11/20/19, at 57. Although she did not disclose her age concurrent with making this trial statement, her previous use of the word "when" could have reasonably been interpreted as applying to the entirety of her year as an eight-year-old. Therefore, it is not inconsistent that she could have also been eight years of age in the month of April.

Regarding the termination of the first incident, the victim specified that

it stopped when Fuentes's wife came home. *See id*., at 77. Although the second interview is slightly inconsistent insofar as the victim described the events leading up to Fuentes's wife entering the apartment, *see* Forensic Interview 2, 4/6/18, at 15, 17, 20, the fact remains that the assault concluded based on Fuentes's wife's actions.

On the second assault, the victim relayed to the interviewer that Fuentes stopped after getting tired, but also explained that Fuentes told the victim his wife was on her way to take her to school. *See id*., at 47-48. At trial, the victim explained that Fuentes stopped because he had heard his wife come home. *See* N.T., 11/20/19, at 76-77. While, again, there are incongruities between the specific event that led to the cessation of the assault, both statements are predicated on the immediate presence of Fuentes's wife.

Insofar as Fuentes contends that the victim contradicted herself as to her hand and feet placement while handcuffed and further provided conflicting information as to the handcuffs' tightness and corresponding pain, such disparities do not rise to the level of "shocking the conscience of the court" given the victim's overarching ability to provide the salient facts relevant to what she had experienced, namely a sexual assault at the hands of Fuentes in a bedroom while being handcuffed, blindfolded, and gagged. *See id*., at 58-59.

In short, given the victim's age at the time of the two incidents, the number of years between those events and Fuentes's trial, the steadfast

nucleus of facts underpinning the assaults as described by the victim, and the explanation provided to the jurors as to a child's ability to report situations similar to those experienced by the victim, the lower court's determination that the verdict reached in this case was not against the weight of the evidence was not an abuse of discretion. Accordingly, Fuentes is due no relief on this basis.

Fuentes next asserts that the sentencing court "abused its discretion by sentencing him consecutively at multiple counts while failing to consider the presence of substantial mitigating evidence." Appellant's Brief, at 16. Fuentes also contends that his sentence is manifestly excessive because his consecutive penalties at multiple counts were "without penological justification or proper reference to the [s]entencing [c]ode." *Id*. (citations omitted).

"The right to appellate review of the discretionary aspects of a sentence is not absolute, and must be considered a petition for permission to appeal." *Commonwealth v. Buterbaugh*, 91 A.3d 1247, 1265 (Pa. Super. 2014). "An appellant must satisfy a four-part test to invoke this Court's jurisdiction when challenging the discretionary aspects of a sentence." *Id.*

An appellant has sufficiently complied with the four-part test when:

(1) the appellant preserved the issue either by raising it at the time of sentencing or in a post[-]sentence motion; (2) the appellant filed a timely notice of appeal; (3) the appellant set forth a concise statement of reasons relied upon for the allowance of appeal pursuant to Pa.R.A.P. 2119(f); and (4) the appellant raises a substantial question for our review.

*Commonwealth v. Baker*, 72 A.3d 652, 662 (Pa. Super. 2013) (citation

omitted). To present a substantial question, an appellant must set "forth a plausible argument that the sentence violates a provision of the sentencing code or is contrary to the fundamental norms of the sentencing process." **Commonwealth v. Dodge**, 77 A.3d 1263, 1268 (Pa. Super. 2013) (citations omitted).

After our thorough review of Fuentes's brief, even assuming that he met the other three elements necessary for review of his claim, we are unable to find any concise statement, and the Commonwealth has objected to this deficiency. **See** Appellee's Brief, at 33. As such, we are absent the jurisdiction to evaluate Fuentes's assertions regarding the discretionary aspects of his sentence.[9]

Fuentes's next argument is that his mandatory minimum sentence corresponding with his rape conviction that was imposed pursuant to 42 Pa.C.S.A. § 9718 (stating that a sentence crafted for this type of offense shall

---

[9] Even if we were to review this issue's underlying merits, it would be without validity. While the gravamen of Fuentes's argument is that the court failed to adequately consider the statutory factors as outlined in 42 Pa.C.S.A. § 9721(b), Fuentes underestimates the legal import of the court's review of Fuentes's pre-sentence report. **See Commonwealth v. Pollard**, 832 A.2d 517, 526 (Pa. Super. 2003) ("A sentencing judge can satisfy the requirement of placing on the record the reasons for imposing sentence by indicating that he or she has been informed by a pre-sentence report. Having been fully informed by the pre-sentence report, the sentencing court's discretion should not be disturbed.") (citations omitted) (internal quotation marks omitted); **see also** Sentencing Hearing, 3/11/20, at 7, 13 (after being apprised of, *inter alia*, information of a mitigating nature regarding Fuentes, trial court stating that it "did read the Presentence Report").

- 14 -

be "not less than ten years") is unconstitutional. Fuentes avers that such a sentence violates his due process rights. Specifically, he "asserts that the imposition of a statutory minimum penalty deprives him and other similarly situated defendants of due process at the sentencing stage." Appellant's Brief, at 21-22. Thereafter, he invokes the three-factor test as espoused by the United States Supreme Court in *Mathews v. Eldridge*, 424 U.S. 319, 335 (1976), to evaluate alleged violations of due process. Fuentes additionally suggests that mandatory minimum sentences violate the separation of powers doctrine because such sentences vest "the determination of a criminal defendant's penalty in the executive branch (by allowance of the legislative branch)[.]" Appellant's Brief, at 23.

Taken broadly, Fuentes appears to be saying that *all* mandatory minimum sentences are unconstitutional. "[T]he legislature has the exclusive power to pronounce which acts are crimes, to define crimes, and to fix the punishment for all crimes." *Commonwealth v. Eisenberg*, 98 A.3d 1268, 1283 (Pa. 2014) (citation omitted). In addition, there is "no constitutional requirement prohibiting the legislature from imposing a mandatory sentence where, in its judgment, such a sentence is necessary." *Id*. (citation omitted). The United States Supreme Court has indicated that a "court may impose[] whatever punishment is authorized by statute for [an] offense, so long as that penalty is not cruel and unusual and so long as the penalty is not based on an arbitrary distinction that would violate the Due Process Clause of the Fifth

Amendment." ***Chapman v. United States***, 500 U.S. 453, 465 (1991). Although it was in the context of a mandatory maximum sentence, this Court "has explicitly held that such mandatory [sentences] do not violate the Eighth Amendment's ban on cruel and unusual punishment or the mandates of individualized sentencing." ***Commonwealth v. Hernandez***, 217 A.3d 873, 879 (Pa. Super. 2019) (citation omitted).

We further note that "[a]s an intermediate appellate court, this Court is obligated to follow the precedent set down by our Supreme Court. It is not the prerogative of an intermediate appellate court to enunciate new precepts of law or to expand existing legal doctrines. Such is a province reserved to the Supreme Court." ***Bell v. Willis***, 80 A.3d 476, 479 (Pa. Super. 2013) (citation omitted). To that end, our Supreme Court has routinely affirmed judgments of sentence that contain mandatory minimums. While there may be some merit to the notion that "[i]mmutable minimum penalties prevent judges from exercising discretion," Appellant's Brief, at 22, it does not follow that, therefore, a statute is inherently rendered unconstitutional because it carries with it a fixed sentence.

Under ***Chapman***, due process is not violated so long as there is a rational basis for the legislature's choice of penalties. ***See*** 500 U.S. at 465. In ***Commonwealth v. Chmiel***, this Court wrote that:

> [t]he crimes in question here, rape and involuntary deviate sexual intercourse, committed against a minor, are crimes of great severity and the legislature in enacting this statute expressed its grave concern for the protection of minors. Specifically, this act is

designed to punish those criminals who prey on the helpless children in our society. Clearly, the nature and severity of the crimes justify the legislature's rationally based minimum sentence.

610 A.2d 1058, 1060 (Pa. Super. 1992) citation omitted). As this case, too, deals with rape and related offenses against a minor, our determination is no different: given the nature of these types of crimes and attendant desire to protect children, the legislature's construction of a minimum sentence was rational and not unconstitutional. Fuentes's challenge fails.

Fuentes's fourth issue asks this court to determine that the parole process for sex offenders is unconstitutional. In summary, Fuentes states that parole is predicated on some level of acceptance of responsibility or admission of guilt, which are incompatible with someone who maintains his or her innocence post-sentencing. This acceptance of responsibility "will almost certainly [lead to] hav[ing] that admission used against [him or her] should [he or she] ever be granted a new trial." Appellant's Brief, at 25.

In response, the Commonwealth presents two counterarguments. First, it states that Fuentes "attempted to raise th[is] issue at sentencing [via] an unsupported assertion that lacked any evidentiary support." Appellee's Brief, at 43. When the court indicated that it could not take judicial notice of Fuentes's claim or framing of the parole system, he explained that "he would supply support when he filed his post[-]sentence motion[.]" *Id*. However, the post-sentence motion did not include any corroborative material. ***See id***. Implicitly, given this dereliction, the Commonwealth is indicating that this

issue has not been preserved for review.

Second, the Commonwealth explicitly contends that this question is not ripe for review, given that Fuentes is not eligible for parole for at least ten more years. **See id**., at 44-45 (citing, further, to **Commonwealth v. Shrawder**, 940 A.2d 436, 439 (Pa. Super. 2007), for the proposition that a challenge is unripe if it concerns "abstract regulations or if it presents issues that may never arise[]").

However, broadly, we agree with the trial court's overview of the nature of parole, wherein the court indicated that it

> is nothing more than a possibility, and, when granted, it is nothing more than a favor granted upon a prisoner by the state as a matter of grace and mercy shown by the Commonwealth to a convict who has demonstrated a probability of his ability to function as a law abiding citizen in society.

Trial Court Opinion, 4/15/21, at 8 (citations omitted). The court further identified that, with it being defined as a favor, "a prisoner has neither an absolute right to parole nor a liberty interest in receiving parole." **Id**. (citations omitted). In short, Pennsylvania provides "no constitutionally protected liberty interest" to a prisoner who has the opportunity to be released from confinement prior to the expiration of his term of incarceration. **Id**. (citation omitted). While the basis of the trial court's conclusion is derived from a case decided by our Sister Court, **Weaver v. Pennsylvania Bd. of Prob. & Parole**, 688 A.2d 766, 770 (Pa. Commw. 1997), we see no basis to deviate from its conclusions.

As the trial court indicated, at no point is Fuentes prohibited from maintaining his innocence. Given the lack of constitutionally protected liberty interest in one seeking parole, there could not have been a violation associated with his eligibility, should he choose to avail himself of such an opportunity years from now. Accordingly, Fuentes's claim fails.

In his penultimate issue, Fuentes insists that one of the expert witnesses, the Director of the Child Advocacy Center at Children's Hospital of Pittsburgh, should have been excluded at trial. Fuentes identifies that the at-issue witness "was in fact a signatory of both of the reports generated … after [the victim's] forensic interviews." Appellant's Brief, at 27. "Because [this expert] signed these reports, it is impossible to claim that [she] had no knowledge of this case. Furthermore, any personal knowledge [she] did possess would allow her to tailor her testimony in a way that is not contemplated by … Pa.R.E. 702." *Id*. Fuentes also asserts that the expert's testimony was not beyond the purview of the average layperson given that her testimony largely reinforced the notion that "different people respond to sexual assault in different ways." *Id*.

"When reviewing challenges to the admission of expert testimony, we leave such decisions largely to the discretion of the trial court, and its rulings thereon will not be reversed absent an abuse of discretion." ***Commonwealth v. Cramer***, 195 A.3d 594, 605 (Pa. Super. 2018) (internal quotation marks and citation omitted).

- 19 -

The trial court found the expert's testimony to be admissible under 42 Pa.C.S.A. § 5920(b), which states, in part, that in a criminal proceeding,

> a witness may be qualified by the court as an expert if the witness has specialized knowledge beyond that possessed by the average layperson based on the witness's experience with … behavioral sciences or victim services issues[] related to sexual violence[] that will assist the trier of fact in understanding the dynamics of sexual violence, victim responses to sexual violence and the impact of sexual violence on victims during and after being assaulted.

42 Pa.C.S.A. § 5920(b)(1). Moreover, if qualified, an expert "may testify to facts and opinions regarding specific types of victim responses and victim behaviors." *Id*., at § 5920(b)(2). The court considered Fuentes's motion to exclude this testimony, but ultimately determined that "expert testimony in victim behavior would, for example, explain why the victim would not disclose in the first forensic interview but disclose in the second one." Trial Court Opinion, 4/15/21, at 9. We perceive no abuse of discretion based on this determination.

As to Fuentes's contention that this expert had specific knowledge of the facts of this case, insinuating that said knowledge formed the basis of her testimony, such an averment is not supported by the record. At trial, this expert stated that her Center conducts 800-900 forensic interviews a year, that she never evaluated the victim's case or interviews, that she did not know about the allegations against Fuentes, and that she had not discussed this case with the Commonwealth or with the victim. *See* N.T., 11/20/19, at 103, 124. The expert made clear that she had "no particular opinion as to whether

- 20 -

[the victim] is impacted by any of the factors that [she] described[.]" ***Id***., at 127. Instead, in providing generalized testimony about a trial-relevant topic, the expert's knowledge and experience related to child sexual victimology came from her many years of working and studying in that field. As such, on this basis, too, it was not an abuse of discretion for the court to deny Fuentes's motion.

In his final issue, Fuentes claims that the trial court failed to give any sort of credit for the time he spent incarcerated prior to his trial, amounting to what Fuentes has ascertained to be 677 days. ***See*** Appellant's Brief, at 28. Fuentes claims this time credit "is required by law pursuant to 42 Pa.C.S.[A]. § 9760(1).

In response, the Commonwealth concedes that its review has determined that Fuentes "did not receive any credit for time spent in pretrial incarceration as all relevant sections for [c]redit have the notation: '0 days.'" Appellee's Brief, 53. The Commonwealth continues by stating that "the case should be remanded for the trial court to provide for time credit." ***Id.***

Although Fuentes is raising this time credit assertion for the first time on appeal, it is a challenge to the legality of his sentence and therefore cannot be waived. ***See Commonwealth v. Foster***, 17 A.3d 332, 336 (Pa. 2011). Given our review of the record, we reach the same conclusion as the Commonwealth: this case must be remanded.

Accordingly, in finding validity to Fuentes's final argument, while we

affirm Fuente's convictions, we vacate Fuentes's judgment of sentence and remand for the court to determine what credit, if any, Fuentes is due as a result of his time spent in custody awaiting trial on these present convictions and to thereafter resentence accordingly.

Judgment of sentence vacated. Case remanded for resentencing. Jurisdiction relinquished.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date:  3/9/2022